GLOBAL NAPS, INC., Plaintiff,

v.

BELL ATLANTIC–NEW JERSEY,
INC., et al., Defendants.

Civil Action No. 99–4074 (JAG).

United States District Court,
D. New Jersey.

Sept. 30, 2003.

James H. Laskey, Norris, McLaughlin & Marcus, PC, Somerville, N.J., Christopher W. Savage, Cole, Raywid, & Braverman, Washington, DC, for Plaintiffs.

Anne S. Babineau, Wilentz, Goldman & Spitzer, Woodbridge, NJ, Aaron M. Panner, Kellogg, Huber, Hansen, Todd & Evans, Washington, DC, for Defendant Verizon.

**OPINION**

GREENAWAY, District Judge.

### INTRODUCTION

This matter comes before the Court on defendant's, Bell Atlantic–New Jersey, Inc. ("Verizon"), motion for judgment on the pleadings dismissing Counts IV and V of plaintiff's, Global NAPs, Inc. ("GNAPs"), complaint. For the reasons discussed below Counts IV and V are dismissed.

### FACTS

GNAPs is a telecommunications corporation that provides, or is authorized to provide, telecommunications services in various states. In the instant case, GNAPs sought to enter Verizon's local telephone market by negotiating an interconnection agreement with Verizon. After negotiations between the parties regarding the interconnection agreement failed, GNAPs pursued its administrative remedies before the New Jersey Board of Public Utilities (the "BPU"). This case arises out of the arbitration between GNAPs and Verizon, and the aftermath of the proceedings.

The following represents a summary of the relevant background and facts gleaned from GNAPs's Complaint and the parties' submissions on Verizon's Motion for Judgment on the Pleadings.

### I. The Telecommunications Act of 1996

Congress passed the Telecommunications Act of 1996 ("the 1996 Act"), Pub.L. No. 104–104, 110 Stat. 56 (1996) (codified at scattered sections of 47 U.S.C.), to promote competition in the telecommunications industry, including the previously monopolized local telephone markets. *See* Telecommunications Act of 1996, Pub.L. No. 104–104, 110 Stat. 56, 56; *see also* H.R. Conf. Rep. No. 104–458, at 113 (1996), *reprinted in* 1996 U.S.C.C.A.N. 124; 142 Cong. Rec. S718 (1996) (statement of Sen. Robert Dole ®–Kan.) commenting that the 1996 Act will "provide for a pro-competitive, deregulatory national policy framework designed to accelerate rapid private sector deployment of advanced telecommunications and information technologies and services to all Americans by opening all telecommunications markets to competition".

To support the goal of increased competition, the 1996 Act imposes certain obligations on incumbent local exchange companies ("ILECs"). These obligations are

designed to allow new entrants, known as competitive local exchange companies ("CLECs"), to use some or all of the ILECs' established networks to offer competitive local telephone service.

Section 251 of the 1996 Act describes the various ways ILECs are required to share their networks with competitors in order to promote market entry by CLECs, and sets out detailed rules implementing the general duty of telecommunications carriers to interconnect with each other's facilities and equipment. *See* 47 U.S.C. § 251. When a CLEC seeks to enter a new market, the ILEC must "provide ... interconnection with" the incumbent's existing network, § 251(c)(2), and the parties must then establish "reciprocal compensation arrangements" for transporting and terminating the calls placed by each others' customers. § 251(b)(5). Section 251 of the 1996 Act also outlines the substantive ways in which potential competitors may enter local telephone markets by using an incumbent provider's existing networks. To this end, § 251 details the ILEC's obligation to provide requesting CLEC's interconnection, unbundled network elements, and services for resale. *See* 47 U.S.C. §§ 251(c)(2)-(4).

Section 252 of the 1996 Act sets forth procedures by which CLECs may request and obtain interconnection, unbundled network elements and services for resale from an ILEC, pursuant to § 251. Specifically, § 252 codifies the framework for the negotiation, arbitration, and approval of interconnection agreements between ILECs and CLECs. *See* 47 U.S.C. § 252. Under the 1996 Act, ILECs and CLECs are required to engage in good faith negotiations regarding the terms and conditions of the interconnection agreement. *See* 47 U.S.C. § 252(b)(5). If negotiations fail, either party may petition the state commission for arbitration of any unresolved issues. *See* 47 U.S.C. § 252(b)(1). If a state com-

mission elects not to assume responsibility, the FCC retains authority to conduct arbitration proceedings. *See* 47 U.S.C. § 252(e)(5). All agreements, whether adopted by mutual negotiation or arbitration, are subject to review by the state commission or the FCC. *See* 47 U.S.C. § 252(e)(1). If the state commission does not take action on an arbitrated agreement within the allotted time period, the agreement is deemed approved. *See* 47 U.S.C. § 252(e)(4).

When a state commission makes a determination, any party "aggrieved" by such determination may file suit in District Court regarding "whether the agreement or statement meets the requirements of Section[s] 251 ... and [§ 252]." *See* 47 U.S.C. § 252(e)(6). When a state commission opts not to act and the FCC assumes the regulatory role, the Hobbs Act, 28 U.S.C. § 2342, authorizes federal appellate court review of orders of the FCC.

Finally, a CLEC need not negotiate a customized interconnection agreement to enter an ILEC's existing market. Section 252(i) provides an alternate means for establishing interconnection. Under § 252(i), "[a] local exchange carrier shall make available any interconnection, service, or network element provided under an agreement approved under this section to which it is a party to any other requesting telecommunications carrier upon the same terms and conditions as those provided in the agreement." *See* 47 U.S.C. § 252(i). This provision allows a CLEC to adopt or "opt into" the terms and conditions of an existing interconnection agreement between the ILEC and a different telecommunications carrier.

## II. Procedural History

On January 26, 1998, GNAPs sought to enter into an interconnection agreement with Verizon and requested interconnection and network elements from Verizon,

pursuant to 47 U.S.C. § 251(c) and 252(a).[1] (Compl.¶ 34.)[2] The parties could not agree on all the issues, and when negotiations between the parties failed to yield a binding executed interconnection agreement GNAPs filed a petition "for Arbitration of Interconnection Rates, Terms and Conditions and Related Relief" with the BPU on June 30, 1998, pursuant to 47 U.S.C. § 252(b)(1).[3] (Compl ¶¶ 34–35.)

In September 1998, after they filed for arbitration, and while the requested arbitration was still pending, GNAPs decided to try another strategy for interconnection and sought to "opt into" an existing interconnection agreement, previously approved by the BPU, between Verizon and MFS Intelenet of New Jersey, Inc. (the "MFS Agreement"). (Compl.¶ 36.) The parties however, could not reach an agreement regarding GNAPs's "opt in" rights. (Compl.¶ 37.)

On September 15, 1998, the BPU appointed an arbitrator to hear the parties' dispute. (Compl.¶ 39.) Following the parties' submissions to the Arbitrator regarding the unresolved issues, an arbitration hearing was held on October 21, 1998. (Compl.¶ 39.) On October 26, 1998, the Arbitrator issued his Interim Final Decision (the "Interim Decision"). (Compl.¶ 40.)

In his Interim Decision, the Arbitrator concluded *inter alia*, that (1) Global was entitled to opt into the MFS Agreement; (2) the duration of the agreement between GNAPs and Verizon should be the same, approximately three years, as that of the original MFS Agreement; and (3) calls to internet service providers ("ISPs") were eligible for reciprocal compensation under the MFS Agreement, and therefore calls to ISPs would be eligible for reciprocal compensation under the agreement to be executed between Verizon and GNAPs.[4] (Compl.¶ 40.)

Under BPU rules, the parties had five (5) business days following the arbitrator's decision to enter into an interconnection agreement implementing the arbitrator's decision, and to submit the agreement to the BPU for review. (Compl.¶ 41.) Thus, an executed GNAPs/Verizon interconnection agreement was due to the BPU on November 1, 1998; however, neither party submitted an interconnection agreement on that date. According to GNAPs, this failure resulted from Verizon's wrongful refusal to enter into an agreement. (Compl.¶ 41.)[5]

---

1. Section 251(c) imposes the duty to "interconnect" on incumbent carriers. Section 252(a) authorizes parties to enter into interconnection agreements through voluntary negotiations, or through mediation at the state commission. *See* 47 U.S.C. §§ 251(c)(2) and 252(a).

2. "Compl." refers to Global Naps, Inc.'s "Complaint for Equitable and Declaratory Relief and for Damages," filed on August 26, 1999.

3. Section 252(b)(1) allows "the carrier or any other party to the negotiation [to] petition a State commission to arbitrate any open issues [regarding the proposed interconnection agreement]." *See* 47 U.S.C. § 252(b)(1).

4. It appears that the arbitration and Interim Decision involved the disputed terms of the proposed opt-in agreement, and not the issues raised in the original negotiations between the parties. In fact, neither party has specifically identified what issues were in dispute during their initial attempts to negotiate an interconnection agreement.

5. Although Verizon claims that "this case can be understood only against the backdrop of the controversy over a single 1996 Act provision ...," the exact details regarding the parties' dispute over reciprocal payments to ISPs, one of the terms that the parties had particular difficulty with, are not particularly relevant for purposes of this motion. In short, Verizon argued that the Interim Decision, and the interconnection agreement pro-

Throughout November 1998, the parties submitted various motions, responses, and other pleadings to the BPU regarding their continuing dispute over the terms of the interconnection agreement. (Compl.¶ 42.) The BPU did not take final action to resolve this matter until July 12, 1999, when it issued its Decision and Order (the "BPU Decision and Order"). (Compl.¶ 43.) The BPU Decision and Order rejected the two key points in the Arbitrator's Interim Decision of most significance to GNAPs and Verizon. (Compl.¶ 43.) Specifically, the BPU determined: 1) not to grant reciprocal compensation for ISP-bound traffic; and 2) that the duration of the interconnection agreement between GNAPs and Verizon should not be three full years, but that the agreement should instead terminate on March 2, 2001, the termination date for the preexisting MFS agreement. (Compl.¶¶ 44, 45.)

The BPU Decision and Order also directed the parties to submit for approval a fully executed interconnection agreement reflecting its decision within five (5) business days of the date of the BPU Decision and Order. By letter dated July 19, 1999, and expressly pursuant to the BPU Decision and Order, Verizon filed an interconnection agreement executed by both Global and Verizon to become effective as of July 26, 1999 (hereinafter, the "Agreement").

### III. The Instant Action

GNAPs commenced this lawsuit on August 26, 1999, alleging violations of §§ 251 and 252 of the 1996 Act. The first three counts of the Complaint are directed solely towards the BPU and its individual commissioners, and are not the subject of this motion. (See Compl. Counts I–III.)[6] Counts IV and V are directed at Verizon.

In Count IV, GNAPs contends that Verizon failed to "cooperate with the State commission in carrying out its functions as an arbitrator," thereby violating § 251(c)(1)'s obligation to negotiate in good faith. (Compl.¶ 66) (internal quotation marks omitted). GNAPs alleges that Verizon violated this duty by refusing to execute an interconnection agreement implementing the Interim Decision. (Compl.¶ 67.)

Count V alleges that Verizon violated § 252(i) of the 1996 Act by failing to enter into an agreement that provided GNAPs the same interconnection terms and conditions as the MFS Agreement. (Compl.¶¶ 70–71.) Although GNAPs does not list the specific terms or conditions that Verizon allegedly denied to provide, the Complaint suggests that GNAPs's principal claim is that Verizon violated § 252(i) by refusing to: (1) execute an interconnection agreement with GNAPs for a term of three years, the original duration as the MFS Agreement; and (2)

posed by GNAPs failed to take into account, and actually contravened, an FCC decision regarding reciprocal payments to ISPs. The relevant fact for purposes of this motion is that this issue, along with others, remained in dispute and because of this, Verizon refused to execute the interconnection agreement proposed by GNAPs incorporating the disputed terms. Instead, Verizon proposed an alternate agreement which it claimed actually incorporated both the Interim Decision and the FCC decision and order.

**6.** These counts allege that the BPU's conduct of the proceeding below violated federal law in various ways. Count I alleges that the BPU took too long to reach a decision; Count II alleges that the BPU had to accept the conclusions of the Arbitrator; and Count III alleges that the BPU should have extended the MFS Agreement even further past its original termination date. On April 14, 2000, the BPU defendants moved to dismiss these claims on Eleventh Amendment grounds. This Court denied that motion in its Order filed December 29, 2000, and Opinion filed January 29, 2001.

agree that calls to ISPs were subject to the payment of reciprocal compensation under the terms of the MFS Agreement. (Compl.¶¶ 44, 45.)

GNAPs is seeking equitable and declaratory relief, compensatory damages, attorney's fees and costs of suit, and such further relief as the Court deems just and reasonable. (Compl.¶¶ 29–30.)

Verizon filed its Answer on October 29, 1999.[7] On June 21, 2001, Verizon moved for judgment on the pleadings, pursuant to Federal Rule of Civil Procedure 12(c), on three grounds.[8] First, Verizon contends that Counts IV and V, alleging violations of the 1996 Act, fail to state a claim because: 1) under the remedial scheme set forth in the Telecommunications Act of 1996, these claims must first be brought before the state commission. (Moving Memo at 11–19)[9]; and 2) the Telecommunications Act of 1996 provides that § 206 does not apply to violations of §§ 251 and

252 of the 1996 Act. (Moving Memo at 19–24.) Second, Verizon contends that its actions before the BPU regarding the arbitrator's Interim Decision are protected activities under the *Noerr–Pennington* doctrine. (Moving Memo at 24–26.) Finally, Verizon states that this Court should grant summary judgment in its favor because GNAPs's claims must fail on the merits. (*See* Moving Memo at 26–30.)

This Court heard oral argument on Verizon's motion on August 9, 2001.

## DISCUSSION

### I. Standard for Judgment on the Pleadings

Motions to dismiss for failure to state a claim, pursuant to Fed.R.Civ.P. 12(b)(6), must be "made before further pleading if further pleading is permitted"; that is, they must be brought before, and in lieu of, filing answers. *See* Fed.R.Civ.P. 12(b)(6). By contrast, a Rule 12(c) motion

---

**7.** Verizon filed an Amended Answer to the Complaint on September 20, 2001.

**8.** Verizon also moved, in the alternative, for summary judgment, stating that "[t]his Court should not reach the merits of GNAPs' (sic) claims. But if it does, it should grant summary judgment in Verizon's favor on the administrative record." (Defendant's Memorandum of Law in Support of Motion for Judgment on the Pleadings, filed June 21, 2001 ("Moving Memo") at 26.)

Pursuant to Federal Rule of Civil Procedure 12(c), this Court has the discretion to decide whether to convert a motion for judgment on the pleading to one for summary judgment. In the instant case, this Court declines to exercise such discretion. Furthermore, the additional materials submitted by the parties do not compel that the motion be converted to one for summary judgment, because these materials are within our purview on a motion to dismiss. Regarding matters of public record, we may consider these documents without converting the motion for judgment on the pleadings into a motion for summary judgment. *See Pension Benefit Guaranty Corp.*, 998 F.2d 1192, 1196 (3d Cir.

1993) (concluding that matters of public record may be considered on a motion to dismiss). To the extent that the parties have submitted documents that are not matters of public record, these materials will convert the motion to dismiss into one for summary judgment if the Court relies on them. *See* Fed.R.Civ.P. 12(c). It is within this Court's discretion whether to rely on them or not. *See id.; see also* 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1366, at 491 (2d ed.1990). Because "in our circuit a court must notify the parties before converting a motion to dismiss into a motion for summary judgment", *In re Rockefeller Ctr. Properties*, 184 F.3d 280, 287–88 (3d Cir.1999), and because GNAPs objects to conversion at this juncture, arguing that genuine issues of material fact requiring discovery exist, this Court declines to rely on these additional materials, and will not construe Verizon's motion as a motion for summary judgment.

**9.** "Moving Memo" refers to Defendant's Memorandum of Law in Support of Motion for Judgment on the Pleadings, filed June 21, 2001.

may be made "after the pleadings are closed but within such time as not to delay the trial",.... *See* Fed.R.Civ.P. 12(c). As Verizon has answered the Complaint, they properly have brought their motion to dismiss as a motion for judgment on the pleadings, pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ.P.") 12(c).

The difference between Rules 12(b)(6) and 12(c) is purely procedural as 12(c) requests for dismissal are governed by the same standards as 12(b)(6) motions. *See Turbe v. Government of the Virgin Islands*, 938 F.2d 427, 428 (3d Cir.1991). Accordingly, this Court must accept all of Plaintiff's allegations as true and "draw all reasonable factual inferences in favor of the Plaintiff." *Turbe*, 938 F.2d at 428; *see also Jablonski v. Pan American World Airways*, 863 F.2d 289, 290–91 (3d Cir. 1988) (citing *Society Hill Civic Ass'n v. Harris*, 632 F.2d 1045, 1054 (3d Cir.1980)). Furthermore, "[u]nder Rule 12(c), like Rule 12(b)(6), judgment will not be granted unless the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law." *Society Hill Civic Ass'n v. Harris*, 632 F.2d 1045, 1054

(3d Cir.1980) (citation omitted); *see also Turbe*, 938 F.2d at 428.

## II. Liability for Violations of the 1996 Act Under 47 U.S.C. §§ 206 and 207

### A. Under the 1996 Act's Remedial Scheme Claims Involving the Negotiation and Approval of Interconnection Agreements Should be Brought to State Commissions First

Verizon's primary argument is that Counts IV and V should be dismissed because they are inconsistent with the remedial scheme established by the 1996 Act. According to Verizon, Counts IV and V, seeking redress for violations of §§ 251 and 252 of the 1996 Act, raise matters that, pursuant to § 252(e)(6), must first be brought before the BPU. (Moving Memo at 18.)

This argument requires this Court to address the question of whether the statutory-review scheme in § 252(e)(6) of the 1996 Act prevents a district court from exercising subject matter jurisdiction over claims that a party has violated §§ 251 and 252 of the 1996 Act.[10] This Court finds that it does.

---

**10.** Although Verizon moved for judgment on the pleadings, pursuant to Fed.R.Civ.P. 12(c), Verizon's argument that Counts IV and V should be dismissed because these matters must first be presented to the BPU, and the cases cited by Verizon in support of this argument, indicate that the motion should actually be construed as a motion to dismiss for lack of subject matter jurisdiction.

Although neither party has directly raised the issue of subject matter jurisdiction, "federal courts have the duty, ... where the issue of jurisdiction is not raised by any party, to inquire into their jurisdiction to act and to deny relief where jurisdiction is lacking." *Pharmadyne Laboratories, Inc. v. Kennedy*, 596 F.2d 568, 570 n. 3 (3d Cir.1979) (citations omitted). Accordingly, this Court reviews Verizon's motion under the standard for a motion to dismiss for lack of subject matter

jurisdiction, pursuant to Fed.R.Civ.P. 12(b)($l$).

Unlike a motion to dismiss for failure to state a claim, pursuant to Fed.R.Civ.P. 12(b)(6), in a motion to dismiss for lack of subject matter jurisdiction, pursuant to Fed. R.Civ.P. 12(b)($l$), no presumption of truthfulness attaches to the allegations in the complaint and the court may consider matters outside the pleadings such as affidavits and other material properly before the court. *Mortensen v. First Federal Savings & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir.1977). In a Rule 12(b)($l$) motion, "the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Mortensen*, 549 F.2d at 891. "[T]he existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. Moreover, the plaintiff will have the burden of proof that

Section 252(e)(6) of the 1996 Act states: "[i]n any case which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 of this title and this section." 47 U.S.C. § 252(e)(6). Thus, under § 252(e)(6), a federal court only has subject matter jurisdiction under the 1996 Act once a State commission makes a determination.[11]

Relying on the principles articulated in *Thunder Basin Coal Co. v. Reich,* 510 U.S. 200, 114 S.Ct. 771, 127 L.Ed.2d 29 (1994), Verizon argues that under the remedial scheme established by the 1996 Act, this Court only has jurisdiction to review a determination by the BPU. Thus, Verizon contends that because Counts IV and V do not seek review of any determination by the BPU, but rather allege violations of the 1996 Act itself, these claims must be dismissed.

GNAPs counters that *Thunder Basin* "does not apply here." (Oppos. Memo at 3.)[12] According to GNAPs's interpretation of *Thunder Basin,* "the Court ruled that Congress's failure to expressly preclude a district court challenge to the interlocutory

actions did not mean that such a challenge was available." (Oppos. Memo at 14.) This interpretation appears to confuse the actual holding in *Thunder Basin* with the application of the principles articulated by that holding.

In *Thunder Basin* the Supreme Court stated, "[i]n cases involving delayed judicial review of final agency actions, we shall find that Congress has allocated initial review to an administrative body where such intent is 'fairly discernible in the statutory scheme.' Whether a statute is intended to preclude initial judicial review is determined from the statute's language, structure, and purpose, its legislative history, and whether the claims can be afforded meaningful review." *Thunder Basin,* 510 U.S. at 207, 114 S.Ct. 771 (citations omitted).

Applying this analysis to the facts before it, including the fact that the statute in question did not authorize district court jurisdiction under the circumstances, *see Thunder Basin,* 510 U.S. at 208–09, 114 S.Ct. 771, the Supreme Court held that the statute's "comprehensive enforcement structure, combined with the legislative history's clear concern with channeling and streamlining the enforcement process, establishe[d] a 'fairly discernible' intent to

jurisdiction does in fact exist." *Mortensen,* 549 F.2d at 891. The plaintiff must not only demonstrate that a controversy existed at the time it filed suit but that it continues to exist throughout the litigation. *Spectronics Corp. v. H.B. Fuller Co.,* 940 F.2d 631, 635 (Fed.Cir. 1991). A motion to dismiss for lack of subject matter jurisdiction predicated on the legal insufficiency of a claim may be granted if the claim "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or . . . is wholly insubstantial and frivolous." *Kehr Packages Inc. v. Fidelcor Inc.,* 926 F.2d 1406, 1408–09 (3d Cir.1991), *cert. denied,* 501 U.S. 1222, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991) (quoting *Bell v. Hood,* 327 U.S. 678, 683, 66 S.Ct. 773, 90 L.Ed. 939 (1946)).

**11.** "Determination" means the decision or order of a state commission approving or rejecting a final, executed interconnection agreement between the parties. *See GTE North v. Glazer,* 989 F.Supp. 922, 925 (N.D.Ohio 1997); *GTE North v. McCarty,* 978 F.Supp. 827, 834 (N.D.Ind.1997); *GTE Northwest v. Hamilton,* 971 F.Supp. 1350, 1353–54 (D.Or. 1997); *GTE South v. Morrison,* 957 F.Supp. 800, 804 (E.D.Va.1997).

**12.** "Oppos. Memo" refers to Opposition of Global NAPs, Inc. to Bell Atlantic–New Jersey, Inc.'s Motion for Judgment on the Pleadings, filed June 21, 2001.

preclude district court review." *Thunder Basin*, 510 U.S. at 216, 114 S.Ct. 771 (citation omitted).

■ This Court agrees with those district courts who, applying the principles articulated in *Thunder Basin*, have concluded that the intent of the statutory scheme set out in §§ 251 and 252 for addressing the negotiation, approval, and enforcement of interconnection agreements is to: 1) make state commissions the initial decision maker regarding claims involving these matters; and 2) limit federal district court jurisdiction to the review of state commission "determinations" or final negotiated, or arbitrated, agreements. *See Atlantic Alliance Telecomm., Inc. v. Bell Atlantic*, No. 99 CV 4915, 2000 U.S. Dist. LEXIS 19649, at *16–17(E.D.N.Y. April 19, 2000) (analyzing language, structure, purpose, and legislative history of 1996 Act to determine whether Congress intended to allocate initial review of claim that party violated § 251(c)(1) by failing to negotiate in good faith to state commissions); *see also GTE Northwest v. Hamilton*, 971 F.Supp. at 1354; *GTE North v. Glazer*, 989 F.Supp. at 925.

GNAPs also states that its "claims against Verizon do not arise from the establishment or interpretation of terms of an agreement [or a determination by the BPU, but rather] from Verizon's failure in its own right to abide by requirements that Sections 251 and 252 place *on Verizon itself*." (Oppos. Memo at 4) (emphasis in original). As such, GNAPs argues that *Thunder Basin* is inapplicable because the "relief [GNAPs] seeks falls outside the scope of matters committed to State regu-

lators by the 1996 Act." (Oppos. Memo at 4.) This Court disagrees.

Section 252 sets out the procedures for the negotiation, arbitration, and approval of interconnection agreements. This procedure includes four steps: 1) voluntary negotiations, § 252(a); 2) the right to petition the state commission to arbitrate any issues unresolved through voluntary negotiations, § 252(b); 3) state commission (or FCC) review, and approval or rejection of the proposed interconnection agreement, § 252(e)(1), (2), (4) & (5), and 4) federal district court review of the state commission's actions, § 252(e)(6). Regardless of how GNAPs attempts to describe its claims against Verizon, the gravamen of GNAPs's case is a dispute over the terms of the proposed interconnection agreement between GNAPs and Verizon, and the negotiation process regarding the establishment of these terms. Disputes of this type are squarely within the scope of matters committed to state regulators.

**B. Sections 206 and 207 Were Not Intended to Establish Federal District Court Jurisdiction Over Actions Concerning Violations of Sections 251 and 252**

GNAPs contends that [regardless of whether this Court has jurisdiction under § 252(e)(6)] this Court has jurisdiction over its §§ 251 and 252 claims under other provisions of Chapter 5 of the 1996 Act, specifically §§ 206 and 207.[13] (Oppos. Memo at 8.) GNAPs maintains that because §§ 251 and 252 were intentionally incorporated into the pre-existing Communications Act of 1934 these amendments do not operate independently of the 1996 Act.

**13.** In the Complaint, GNAPs also asserts jurisdiction under 28 U.S.C. § 1331. However, this Court agrees with the other courts that have addressed this question and declined to assert jurisdiction under § 1331 for claims arising under the 1996 Act. *See Bell Atlantic–Virginia, Inc. v. WorldCom Technologies of* *Virginia, Inc.*, 70 F.Supp.2d 620, 624 (E.D.Va. 1999) (citing cases); *see also GTE North, Inc. v. Strand*, No. 5:97–CV–01, 1997 WL 811422, *3, 1997 U.S. Dist. LEXIS 21961, at *12–13 (W.D.Mich. June 2, 1997). Accordingly, this Court's jurisdictional analysis is limited to the 1996 Act.

Thus, according to GNAPs, because "Congress put Sections 251(c)(1) and 252(i) in 'the 1996 Act' [and because] Sections 206 and 207 establish a damages remedy for violations of 'the 1996 Act,' ... Sections 206 and 207 establish a damages remedy for violations of Sections 251(c)(1) and 252(i)." (Oppos. Memo at 3.) [14]

GNAPs relies on one unreported case, *AirTouch Paging of California v. Pacific Bell*, No. C–98–2216 MHP, 1999 U.S. Dist. LEXIS 16615 (N.D.Cal.1999), to support its argument that §§ 206 and 207 vest this Court with jurisdiction over claims involving violations of §§ 251 [and 252] the 1996 Act. (See Oppos. Memo at 11.)

In *AirTouch Paging*, the District Court held that it had subject matter jurisdiction, pursuant to § 207, over plaintiff's claim that the defendant had violated § 252(i).[15] *See AirTouch Paging*, 1999 U.S. Dist. LEXIS 16615, at *24. The court reasoned that, because a violation of § 252(i) necessarily involved an interconnection agreement that already had received final approval by state commissions, "permitting a party who alleges a violation of section 252(i) to seek relief in either district court or with the FCC pursuant to section 207 is in accordance with the Telecom Act's unique framework: while inviting state commissions to arbitrate and approve interconnection agreements, the federal courts retain exclusive jurisdiction to ensure that those agreements meet federal requirements." *Id.* at *24 (citation omitted).

While, *AirTouch Paging* appears to be on point, there is a subtle but important distinction between *AirTouch Paging* and the instant case. In *AirTouch Paging*, the plaintiff argued that because it had not sought to negotiate with defendants, the dispute arising from its request for an interconnection agreement under § 252(i) was not subject to the negotiation and approval process set forth in §§ 252(a)-(e). *See AirTouch Paging*, 1999 U.S. Dist. LEXIS 16615, at *14. Noting that the intent of § 252(i) was "to provide requesting competitors relief by sparing them the formal negotiation and approval procedure required for initial requests for an agreement," *Id.* at *16, the Court stated that "the Congressional purpose of promoting competition on a nondiscriminatory basis would be defeated if AirTouch was required to undergo the multiple-step negoti-

---

**14.** Together Sections 206 and 207 provide rights of action for violations of the Communications Act of 1934. Section 206 creates a cause of action and § 207 grants jurisdiction to federal district courts over such actions.

Specifically, § 206 states: "In case any common carrier shall do, or cause or permit to be done, any act, matter, or thing in this chapter prohibited or declared to be unlawful, or shall omit to do any act, matter, or thing in this chapter required to be done, such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this chapter, together with a reasonable counsel or attorney's fee, to be fixed by the court in every case of recovery, which attorney's fee shall be taxed and collected as part of the costs in the case." 47 U.S.C. § 206.

Section 207 provides that: "[a]ny person claiming to be damaged by any common carrier subject to the provisions of this chapter may either make complaint to the Commission as hereinafter provided for, or may bring suit for the recovery of the damages for which such common carrier may be liable under the provisions of this chapter, in any district court of the United States of competent jurisdiction; but such person shall not have the right to pursue both such remedies". 47 U.S.C. § 207.

**15.** In *Airtouch Paging*, the plaintiff claimed that the defendant had violated § 252(i) by refusing to provide plaintiff with an interconnection agreement containing the "same terms and conditions" that defendant had provided to a competing carrier. *See AirTouch Paging*, 1999 U.S. Dist. LEXIS 16615, at *24.

ation and approval process" and determined that, "AirTouch, instead may file a complaint under section 208, on an expedited basis with the FCC." *Id.* at *18–19.

However, because AirTouch had not filed its claim on an expedited basis, pursuant to § 208, but rather had asserted jurisdiction pursuant to § 207, the issue before the court was "whether a party who alleges that a common carrier has violated section 252(i) must first exhaust its administrative remedies with the FCC [pursuant to § 208] before seeking judicial review. Or may the party elect to file a complaint either in federal district court or with the FCC pursuant to section 207?" *Id.* at *20–21.

The actual issue in *AirTouch Paging* involved a party who had not sought to negotiate an interconnection agreement, and thus was not subject to the negotiation and approval process in §§ 252(a)-(e). Under these circumstances, to further § 252(i)'s "Congressional purpose of promoting competition on a nondiscriminatory basis," *Id.* at *18–19, a party is entitled to bring an expedited claim with the FCC, pursuant to § 208 for alleged violations of § 252(i). Under the holding in *AirTouch Paging*, such a party may, pursuant to § 207, elect to file its complaint either before the FCC or in federal district court. This situation is inapposite to the one here where a party has invoked the negotiation and approval process and now seeks to circumvent a particular step in that process.

This Court has found one other case supporting the proposition that §§ 206 and 207 can vest federal courts with jurisdiction to hear claims involving violations of § 251 of the 1996 Act. In *Law Offices of Curtis V. Trinko, LLP v. Bell Atlantic Corp.*, 123 F.Supp.2d 738 (S.D.N.Y.2000), *aff'd in part, vacated in part*, 305 F.3d 89 (2d Cir.2002), the court indicated that "violations of the 1996 Act can form the basis for liability pursuant to sections 206 and 207." *Trinko*, 123 F.Supp.2d at 743.

*Trinko* is also distinguishable from the instant case. In *Trinko*, the plaintiffs were customers of the phone companies, not a competitive phone company seeking to enter the market. The court noted this distinction and, based on the nature of the claim,[16] concluded that "[plaintiffs'] claim [did] not directly implicate the regulatory scheme Congress created to govern the formation of interconnection agreements." *Id.* at 743. Thus, because the plaintiffs' claim did not implicate the scheme set forth in § 252, the plaintiffs were not required to bring their claim under § 252(e), but could instead bring their claim under § 207. *See id.*

■ Based on the above, this Court finds that the decisions in *AirTouch Paging* and *Trinko* do not conflict with those cited by Verizon in support of its argument that GNAPs must first bring its claims alleging violations of §§ 251 and 252 to the BPU before this Court has jurisdiction over those claims. Although the courts in *AirTouch Paging* and *Trinko* upheld federal jurisdiction under §§ 206 and 207 for alleged violations of § 251(i) and (c)(2)(C), respectively, it is apparent that in both cases the courts were influenced by the fact that the plaintiffs' actions and/or claims did not implicate § 252's statutory scheme regarding interconnection agreements. *See Trinko*, 123 F.Supp.2d at 743

---

**16.** The plaintiffs in *Trinko*, alleged that Bell Atlantic violated § 251(c)(2)(C)'s duty to provide "interconnection ... that is at least equal in quality to that provided by the local exchange carrier to itself ... or any other party to which it provides interconnection," 47 U.S.C. § 251(c)(2)(C), by providing them with "a level of service that [was] materially below the level that [was] accorded customers of Bell Atlantic's Local Phone Service in functionally identical circumstances." *Trinko*, 123 F.Supp.2d at 740.

(holding that "violations of the 1996 Act can form the basis for liability pursuant to sections 206 and 207 [when the claim] does not directly implicate the regulatory scheme Congress created to govern the formation of interconnection agreements"); *AirTouch Paging*, 1999 U.S. Dist. LEXIS 16615, at *15–24 (holding that "permitting a party [not subject to §§ 252(a)-(e)'s negotiation and approval process] to seek relief [for an alleged violation of § 252(i)] in either district court or with the FCC, pursuant to § 207, is in accordance with the 1996 Act's unique framework"). In contrast, the cases cited by Verizon support the proposition that claims, such as GNAPs's, that implicate the negotiation and approval process for interconnection agreements are the types of complaints that Congress intended to allocate to the initial review of state commissions.[17]

While GNAPs is correct in stating that §§ 251 and 252 cannot be divorced from the 1996 Act, GNAPs fails to acknowledge the distinct role §§ 206 and 207 have vis-a-vis § 252(e)(6). Specifically, §§ 206 and 207 date back to the original 1934 Communications Act, and were enacted to "provide[ ] a cause of action for consumers who were injured by errors in delivery of telegraphs and similar acts or omissions." *Atlantic Alliance Telecomm., Inc.*, 2000 U.S. Dist. LEXIS 19649, at *16–17 (citing cases). In contrast, the Telecommunications Act of 1996 created a comprehensive statutory scheme designed to promote competition in the telecommunications industry by expediting the formation of interconnection agreements between CLECs and ILECs.

Although §§ 251 and 252 may be considered part of the "entire" Communications Act, it is clear that these sections were intended to address issues addressing the negotiation, approval, and enforcement of interconnection agreements.[18] As part of

---

17. *See, e.g.*, cases dismissing claims under the Telecommunications Act of 1996, *Atlantic Alliance Telecomms., Inc. v. Bell Atlantic*, No. 99 CV 4915, 2000 U.S. Dist. LEXIS 19649, at *6 (E.D.N.Y. Apr. 17, 2000); *AT & T Communications of California, Inc. v. Pacific Bell*, 60 F.Supp.2d 997, 1002 (N.D.Cal.1999); *GTE North Inc. v. Glazer*, 989 F.Supp. 922, 924–25 (N.D.Ohio 1997); *GTE North Inc. v. McCarty*, 978 F.Supp. 827, 833 (N.D.Ind.1997); *GTE Northwest Inc. v. Hamilton*, 971 F.Supp. 1350, 1351–52 (D.Or.1997); *GTE Northwest, Inc. v. Nelson*, 969 F.Supp. 654, 656 (W.D.Wash.1997); *GTE South Inc. v. Morrison*, 957 F.Supp. 800, 803–05 (E.D.Va.1997); *AT & T Communications of Illinois, Inc. v. Illinois Bell Tel. Co.*, No. 97 C 0886, 1998 WL 525437, **1–3, 1998 U.S. Dist. LEXIS 12925, at *10–18 (N.D.Ill. Aug.18, 1998); *GTE North Inc. v. Strand*, No. 5:97–CV–01, 1997 WL 811422, *2, 1997 U.S. Dist. LEXIS 21961, at *9 (W.D.Mich. June 2, 1997). Each of these cases involved disputes between incumbent LECs and new entrants over the terms and implementation of interconnection agreements.

18. This Court also notes the distinction between §§ 251 and 252. Section 251 imposes a duty to interconnect on incumbent carriers, and describes the various ways ILECs are required to share their networks. *See* 47 U.S.C. § 251. Under § 251 an ILEC may fulfill its obligation to interconnect by allowing a CLEC to opt into, and adopt the terms of an existing interconnection agreement. *See* 47 U.S.C. § 252(i).

Section 252 sets forth a framework for ILECs and CLECs to negotiate voluntarily a new interconnection agreement. *See* 47 U.S.C. § 252. As part of this framework, § 252 empowers state commissions with the authority to resolve issues arising during the § 252 process. *See* 47 U.S.C. § 252(b). The statute also provides for federal court jurisdiction to review state commission decisions arising during the § 252 process. *See* 47 U.S.C. § 252(e)(6). In fulfilling its § 251 duty to interconnect, an ILEC need not invoke § 252's negotiation and arbitration process.

Accordingly, where a party has not invoked the § 252 process, it is reasonable to conclude that they are not required to bring any disputes that may arise to the state commission first, pursuant to § 252. Because they are not bound by § 252's jurisdictional framework, the party may choose instead to pro-

this scheme, § 252(e)(6) governs jurisdiction where disputes over the negotiation, approval, and enforcement of interconnection agreements are concerned, and Congress intended that such disputes be addressed by state commissions in the first instance. *See Atlantic Alliance Telecomm.,* 2000 U.S. Dist. LEXIS 19649, at *8–15 (analyzing language, structure, purpose, and legislative history of 1996 Act to determine whether Congress intended to allocate initial review of claim that party violated § 251(c)(1) by failing to negotiate in good faith to state commissions). The issue is not that §§ 251 and 252 may be considered part of the Communications Act of 1934, but rather that " §§ 206 and 207 were not enacted as part of the comprehensive scheme set out in the Telecommunications Act of 1996.... Having construed a scheme to expedite the formation of interconnection agreements with input from expert regulators, Congress cannot have anticipated the use of half-century old provisions to evade that process." *Atlantic Alliance Telecomm.,* 2000 U.S. Dist. LEXIS 19649, at *16 (citations omitted).

This Court agrees with those district courts who have determined that allowing a party to bring claims for violations of the 1996 Act, pursuant to §§ 206 and 207, would jeopardize § 252's system of review and the statutory scheme intended to make state commissions the initial deci-

sionmakers regarding interconnection agreements. *See, e.g., Indiana Bell Tel. Co. v. McCarty,* 30 F.Supp.2d 1100, 1104 (S.D.Ind.1998). As such, this Court also concludes that §§ 206 and 207 do not vest district courts with jurisdiction over violations of the 1996 Act. *See, e.g., Atlantic Alliance Telecomm.,* 2000 U.S. Dist. LEXIS 19649, at *16–17 (dismissing claim brought under section 206); *Intermedia Communications, Inc. v. Bellsouth Telecommunications, Inc.,* 173 F.Supp.2d 1282, 1287 (M.D.Fla.2000) (dismissing claims brought pursuant to sections 206 and 207).

The proper procedure for GNAPs to follow, and which GNAPs did in fact follow, if it is dissatisfied with the conduct of negotiations or the proposed terms of an interconnection agreements is to seek arbitration, pursuant to § 252(a)(2) and (b)(1).[19]

Based on the above, this Court finds that it lacks subject matter jurisdiction over GNAPs's claims. Fed.R.Civ.P. 12(h)(3) provides: "Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." Accordingly, Counts IV and V are dismissed, pursuant to Fed.R.Civ. P.12(b)(1).[20]

---

ceed directly to the district court for resolution of any disputes. As discussed above, the holdings in *AirTouch Paging* and *Trinko,* are consistent with this proposition. *See supra* pp. 542–43.

**19.** The relevant portions of 47 U.S.C. § 252 state:

"Any party negotiating an agreement under this section may, at any point in the negotiation, ask a State commission to participate in the negotiation and to mediate any differences arising in the course of the negotiation." 47 U.S.C. § 252(a)(2).

"[A]fter the date on which an incumbent local exchange carrier receives a request for negotiation under this section, the carrier or any other party to the negotiation may petition a State commission to arbitrate any open issues." 47 U.S.C. § 252(b)(1).

**20.** This Court's determination that it lacks subject matter jurisdiction precludes the necessity to address Verizon's alternative grounds for dismissal. However, for the sake of completeness, these arguments will be discussed below.

### C. Sections 206 and 207 of the 1996 Act Do Not Apply to Telecommunications Carriers Carrying Out Their Duties Under Sections 251 and 252

Verizon contends that because it is not providing telecommunications services when carrying out its duties under §§ 251 and 252, it is not subject to the liability created by § 206, which applies only to "common carriers." (Moving Memo at 19–20.) Specifically, Verizon argues that, pursuant to § 153(44), "[a] telecommunications carrier shall be treated as a common carrier under this chapter only to the extent that it is engaged in providing telecommunications services," 47 U.S.C. § 153(44), and its conduct under §§ 251 and 252 does not involve the provision of telecommunications services, it is not subject to the common carrier liability created by § 206. (Moving Memo at 20.)

GNAPs cites to *Federal Trade Commission v. Verity Int'l*, 124 F.Supp.2d 193, 201–02 (S.D.N.Y.2000), in suggesting that the language in the 1996 Act defining "telecommunications carrier" "simply clarifies that carriers may engage in non-carrier activities, and that a carrier engaging in those activities is not subject to utility-style regulation with respect to them." (Oppos. Brief at 16.)

In *Verity*, the court observed that the FCC "has distinguished between basic telecommunications [service] … and enhanced services [and] found that vendors of enhanced services … [are] not engaged in common carrier activity." *Verity*, 124 F.Supp.2d at 201. The court went on to note that the definition of "telecommunications carrier" in the 1996 Act also distinguishes between telecommunications services and other types of services, specifically information services. *See Verity*, 124 F.Supp.2d at 201–02 ("The Telecommunications Act of 1996 likewise distinguishes between telecommunications services and information services, stating that 'a telecommunications carrier shall be treated as a common carrier under this chapter only to the extent that it is engaged in providing telecommunications services.' ").

Thus, the court reasoned that because information services are distinguishable from telecommunications services, pursuant to § 153(44), providers of information services were not subject to the duties and liabilities placed on common carriers, specifically filed tariffs. *See Verity*, 124 F.Supp.2d at 202. This is in fact exactly the argument that Verizon is making. Verizon contends that there is a distinction between providing telecommunications services and their duties under §§ 251 and 252, and because their duties under §§ 251 and 252 do not involve providing telecommunications services, they cannot be treated as common carriers with respect to these duties.

■ Under its interpretation of *Verity*, GNAPs argues that the definition of "telecommunications carrier" is a clarifying definition, intended "merely [to ensure] that the FCC only imposes utility regulation on common carrier services," (Oppos. Brief at 18), and not to "modify, impair or supercede" the liability created by §§ 206 and 207. (Oppos. Brief at 17–19.) This Court does not agree with such a narrow interpretation of *Verity*. The language of the statute is unambiguous, "[a] telecommunications carrier shall be treated as a common carrier under this chapter *only to the extent that it is engaged in providing telecommunications services.*" 47 U.S.C. § 153(44) (emphasis added). It is reasonable to determine that, to the extent that the definition of "telecommunications carrier" may be considered a "clarifying definition," it is meant to avoid subjecting telecommunications carriers to unnecessary liability by clarifying under what cir

cumstances a telecommunications carrier should be subjected to the duties and liabilities imposed on common carriers by other sections of the Communications Act of 1934 and the 1996 Act.

Alternatively, GNAPs argues that even if "only the provision of telecommunication services activates 206/207," (Oppos. Memo at 19), Verizon would still be subject to liability under § 206 because Verizon's duties under § 251(b)(5) entail the provision of telecommunications services.[21] (Oppos. Memo at 19–21.) GNAPs bases this argument on the fact that "Verizon claims that this case can be understood **only** against the backdrop of the controversy over **a single 1996 Act provision-section 251(b)(5)** . . . this critical disputed matter **entails the provision of telecommunications.**" (Oppos. Memo at 19) (emphasis in original).

Even though Verizon did make the above statement, (*see* Moving Memo at 4), this statement is made in the context of explaining the background of one of the challenged terms in the underlying dispute between Verizon and GNAPs regarding the proposed interconnection agreement. GNAPs cannot however, claim that this provision forms the basis for liability with regards to the Complaint because the Compliant does not allege that Verizon violated this provision. Although this provision may provide some context to the underlying dispute between the parties, it is not at issue concerning Verizon's alleged violations of the 1996 Act.

In the provisions of the 1996 Act that Verizon allegedly has violated, it does not appear that providing interconnection to a competitor satisfies the definition of "telecommunications services" for purposes of § 153(44).[22] As a reasonable matter, one could argue, as GNAPs does, that §§ 251 and 252 merely add "a host of new duties for carriers" that "arise out of, and are ancillary to, the activities that make [Verizon a] 'carrier' in the first place, *viz.*, [its] provision of 'telecommunications services' [thus] there is no contradiction between the definition of 'telecommunications carrier' in Section 153(44) and the application of Sections 206/207 to the duties in Sections 251 and 252." (Oppos. Memo at 17.) However, this Court must assume that if the framers of the statute intended to include "interconnection" in the definition of "telecommunications services" they would have done so. Instead, "interconnection" is discussed in terms of "duty" and "obligation," (*see* 47 U.S.C. §§ 251 and 252), not in terms of the activities that carriers engage in with regard to the provision of telecommunications services. As such, this Court concludes that Verizon is not engaged in providing "telecommunications services" when carrying out its duties under §§ 251 and 252 of the 1996 Act, and, pursuant to § 153(44), is not subject to the "common carrier" liability created by § 206.

### III. *Primary Jurisdiction*

 Although neither party has discussed the applicability of the doctrine of

---

**21.** Section 251(b)(5) provides that all local exchange carriers have "[t]he duty to establish reciprocal compensation arrangements for the transport and termination of telecommunications." 47 U.S.C. § 251(b)(5).

**22.** The 1996 Act defines "telecommunications service" as: "the offering of telecommunications for a fee directly to the public, or to

such classes of users as to be effectively available directly to the public, regardless of the facilities used." 47 U.S.C. § 153(46).

The Act in turn defines "telecommunications" as: "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received." 47 U.S.C. § 153(43).

primary jurisdiction, this Court may invoke the doctrine *sua sponte*. *See MCI Telecommunications Corp. v. Teleconcepts, Inc.*, 71 F.3d 1086, 1112 (3d Cir. 1995), *cert. denied*, 519 U.S. 815, 117 S.Ct. 64, 136 L.Ed.2d 25 (1996); *Mars Emergency Med. Servs. v. Township of Adams*, 559 Pa. 309, 319, 740 A.2d 193 (Pa.1999).

In both *AirTouch Paging* and *Trinko*, discussed above, although the courts found that they had jurisdiction to hear the plaintiffs' § 251 claims, pursuant to §§ 206 and 207, both courts noted that under the doctrine of primary jurisdiction, it might be proper to decline to hear claims that might frustrate the goals of the 1996 Act. *See Trinko*, 123 F.Supp.2d at 743; *AirTouch Paging*, 1999 U.S. Dist. LEXIS

16615, at *25. The *Trinko* court in particular noted that "[t]o the extent that this or a similar claim might indirectly implicate the regulatory scheme [set forth in § 252], . . . the doctrine of primary jurisdiction [is] available to insure that judicial action is consistent with the regulatory process." [23] *Trinko*, 123 F.Supp.2d at 743.

 The doctrine of primary jurisdiction applies "to claims properly cognizable in court that contain some issue within the special competence of an administrative agency." *Reiter v. Cooper*, 507 U.S. 258, 268, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993). Referral to an administrative agency for resolution is appropriate if "the matter involves technical or policy considerations which are beyond the court's ordi-

---

**23.** In *AirTouch Paging*, the court declined to apply the primary jurisdiction doctrine because it construed the issue before it as one of "statutory interpretation," which "[did] not involve the statutory reasonableness of tariffs or other technical matters." *AirTouch Paging*, 1999 U.S. Dist. LEXIS 16615, at *27 (citation omitted). Thus, the court concluded that the matter "[did] not require the FCC's policy expertise or specialized knowledge and [was] safely within the conventional experience of judges." *Id.*

*AirTouch Paging* is distinguishable from the instant case. In *AirTouch Paging* the question was whether the issue should be brought before the FCC not, as here, the state commission. The court in *AirTouch Paging* recognized that the issue before it did not fall within the FCC's primary responsibility of promulgating rules establishing minimum national standards to govern the interconnection process, *see, e.g.*, 47 U.S.C. § 251(d)(1) (directing the FCC to establish regulations implementing the interconnection requirements in § 251(a)-(c)); *see also AT & T Corp. v. Iowa Utilities Board*, 525 U.S. 366, 384–85, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999), or within the FCC's expertise with the technical aspects of establishing such rules.

In the case at bar however, the issue is within the state commission's primary responsibility; the negotiation and arbitration process. *See* 47 U.S.C. § 252(b), (e)(1); S.Rep. No. 104–23 at 15 (1995) (Sup.Docs.

No. Y1.1/5:104–23) (stating "[t]he FCC will establish the national minimum standards for opening local telephone networks and other competitive requirements. The States are then responsible for administering, implementing and resolving disputes as telecommunications carriers meet these obligations.").

Although the meaning of the phrase "the same terms and conditions" in § 251(i) may, in some cases, be considered a matter of statutory and/or contract interpretation, here it was the BPU, not the Court or the FCC, that approved the MFS Agreement. Thus, it is the BPU that would know whether there are any specific considerations involved in the MFS Agreement. For example, regarding the term at issue, the length of the agreement, the BPU would know whether there was a particular rationale for the original length of the agreement, and whether this rationale should be extended to the proposed GNAPs/Verizon interconnection agreement.

Furthermore, GNAPs's claim that Verizon refused to offer it the same terms and conditions as those in the MFS Agreement must be examined in the overall context of the negotiation and arbitration process. GNAPs only sought to "opt into" the MFS Agreement after they had invoked the negotiation process and it is clear that the negotiation process is committed to the oversight and jurisdiction of the BPU.

nary competence and within the agency's field of expertise." *MCI Communications Corp. v. American Telephone & Telegraph Co.*, 496 F.2d 214, 220 (3d Cir.1974); *see also Teleconcepts, Inc.*, 71 F.3d at 1103. The doctrine is meant to ensure a "workable relationship between the courts and administrative agencies wherein ... the court can have the benefit of an agency's views on issues within the agency's competence." *Teleconcepts, Inc.*, 71 F.3d at 1105.

The Third Circuit has stated that the doctrine applies when decision-making "is divided between courts and administrative agencies [and] calls for judicial abstention in cases where protection of the integrity of a regulatory scheme dictates primary resort to the agency which administers the scheme. It is now generally accepted ... that the principal justification [for the doctrine] is the need for an orderly and sensible coordination of the work of agencies and courts." *Cheyney State College Faculty v. Hufstedler*, 703 F.2d 732, 736 (3d Cir.1983). "The doctrine requires a court to transfer an issue that involves administrative expertise to the administrative agency charged with exercising that discretion." *Teleconcepts, Inc.*, 71 F.3d at 1105 (citation omitted).

There is no fixed formula for determining whether the doctrine of primary jurisdiction applies and matters should be evaluated on a case-by-case basis. *See United States v. Western Pacific Railroad Co.*, 352 U.S. 59, 64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956); *Aronson v. IDT Corp.*, Civil Action No. 02–1706, 2003 WL 1790970, *2, 2003 U.S. Dist. LEXIS 6659, at *14 (W.D. Pa. April 3, 2003). Some courts have found the following four factors helpful in determining whether to ap-

ply the doctrine: (1)Whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise; (2) Whether the question at issue is particularly within the agency's discretion; (3) Whether there exists a substantial danger of inconsistent rulings; and (4) Whether a prior application to the agency has been made. *See Oh v. AT & T Corp.*, 76 F.Supp.2d 551, 557 (D.N.J.1999) (citation omitted); *AT & T Corp. v. PAB, Inc.*, 935 F.Supp. 584, 589–90 (E.D.Pa.1996).

Applying these factors here, this matter should be referred to the BPU. The 1996 Act sets forth a regulatory scheme that empowers state commissions to oversee the negotiation and arbitration process regarding interconnection agreements and adjudicate the fairness, reasonableness, and/or lawfulness of the proposed terms of such agreements. The BPU's expertise with the nuances and policies of telecommunications practice in general, and interconnection agreements in particular, weigh in favor of a finding that the issues here involve policy considerations within the BPU's particular field of expertise. Furthermore, the potentiality of inconsistent rulings regarding interpreting the terms of agreements previously approved by the BPU militates in favor of referring this issue to the BPU. Finally, GNAPs made a prior application to the BPU, and participated in proceedings before the BPU, regarding the exact issues it now wishes this Court to adjudicate.

For the foregoing reasons, this Court notes that even if it were to determine that it had jurisdiction over GNAPs's claims [24], this Court would refer Counts IV and V for initial determination of the BPU, pur-

---

**24.** This Court has already held that it lacks subject matter over GNAPs's claims. *See su-* *pra* p. 545–46.

suant to the doctrine of primary jurisdiction.

### IV. *The Noerr–Pennington Doctrine*

In addition to claiming that GNAPs has failed to state a claim under the 1996 Act, Verizon argues that GNAPs's claims must be dismissed because Verizon's opposition to the Interim Decision was legitimate petitioning activity, entitled to protection under the *Noerr–Pennington* doctrine. (Moving Memo at 24–26.)

#### A. The Noerr–Pennington Doctrine

Section 2 of the Sherman Act punishes "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States." 15 U.S.C.A. § 2 (West 1998). However, the Supreme Court held in *Noerr* and again in *Pennington* that " 'the Sherman Act does not prohibit ... persons from associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly.' " *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.,* 508 U.S. 49, 56, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993) (citing *Eastern Railroads Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 136, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers v. Pennington,* 381 U.S. 657, 669, 85 S.Ct. 1585, 14 L.Ed.2d 626(1965)). This is known as the *Noerr–Pennington* doctrine.

Under the doctrine, parties are immune for "mere attempts to influence the passage or enforcement of laws." *Noerr,* 365 U.S. at 135, 81 S.Ct. 523. The doctrine was initially applied to efforts intended to influence legislative and executive action. In *California Motor,* stating that "the right to petition extends to all departments of the government," the Su-

preme Court extended the *Noerr–Pennington* doctrine to attempts to influence judicial and administrative actions. *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 510–12, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972).

*California Motor* also recognized a "sham" exception to the doctrine. Under this exception, acts intended to achieve "substantial evils" or prevent a competitor from having "free and unlimited access" to the agencies and courts are not entitled to *Noerr–Pennington* protection. *California Motor,* 404 U.S. at 515, 92 S.Ct. 609. In determining whether conduct is a "sham," courts must first examine whether the conduct was "objectively baseless." *See Professional Real Estate,* 508 U.S. at 60, 113 S.Ct. 1920. "[S]ham litigation must constitute the pursuit of claims so baseless that no reasonable litigant could realistically expect to secure favorable relief." *Professional Real Estate,* 508 U.S. at 62, 113 S.Ct. 1920 (citations omitted). While a good faith attempt to influence judicial and administrative actions does not violate the antitrust laws, when resort to the courts is a mere "sham" to interfere with the business of a competitor, antitrust liability may be imposed. *See Noerr,* 365 U.S. at 144, 81 S.Ct. 523.

The Supreme Court has devised a two-tier definition of "sham" litigation.

First, the lawsuit must be ***objectively baseless*** in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr,* and an antitrust claim premised on the sham exception must fail. Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. Under this second part of our definition of sham, the

court should focus on whether the baseless lawsuit conceals an attempt to interfere directly with the business relationships of a competitor, through the use [of] the governmental process—as opposed to the outcome of that process—as an anticompetitive weapon.

*Professional Real Estate,* 508 U.S. at 60–61, 113 S.Ct. 1920 (emphasis added) (internal citations and quotations omitted).

## B. Applicability of the Noerr–Pennington Doctrine

"The *Noerr–Pennington* doctrine is intended to protect the first amendment rights of individuals to petition their government...." *City of Cleveland v. The Cleveland Electric Illuminating Co.,* 734 F.2d 1157, 1162 (6th Cir.1984), *cert. denied,* 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984). "The crux of the *Noerr–Pennington* immunity is the need to protect efforts directed to governmental officials for the purpose of seeking redress. The doctrine has been applied only to situations involving direct actions made to influence governmental decisionmaking." *Mid–Texas Communications Systems, Inc. v. AT & T Co.,* 615 F.2d 1372, 1382 (5th Cir.1980), *cert. denied,* 449 U.S. 912, 101 S.Ct. 286, 66 L.Ed.2d 140 (1980) (citations omitted).

Verizon contends that "the conduct at issue in GNAPs' (sic) Complaint against Verizon falls squarely within the scope of *Noerr–Pennington.*" (Moving Memo at

25.) Specifically, Verizon argues that its opposition to the Interim Decision and presentation of its own version of the interconnection agreement to the BPU for approval are protected under the doctrine.[25]

GNAPs counters that Verizon's conduct is not entitled to *Noerr–Pennington* protection because "Verizon's refusal to comply with the BPU's rules was a sham designed to facilitate Verizon's plan to delay Global NAPs' (sic) entry into the New Jersey telecommunications market." (Oppos. Memo at 22.)

### 1. *Verizon's Conduct is Entitled to Noerr–Pennington Immunity*

 GNAPs alleges that Verizon's conduct in failing to execute an agreement implementing the Interim Decision, pursuant to BPU rulings is not entitled to *Noerr–Pennington* immunity. (Oppos. Memo at 21–22.) The crux of GNAPs's argument is that Verizon did not have the right to challenge the Interim Decision and was required to implement the Interim Decision whether they agreed with it or not. (Oppos. Memo at 22.) GNAPs also "strongly disagrees that Verizon's excuse [for not following the BPU's rules and executing an Interconnection Agreement implementing the Interim Decision] was legitimate, or that Verizon itself even though it was." (Oppos. Memo at 22.) It is clear however, that under *California*

---

**25.** Verizon challenged the Interim Decision regarding the termination date of the proposed interconnection agreement between GNAPs and Verizon, and the treatment of Internet-bound calls for purposes of reciprocal compensation. (*See* Moving Memo at 6.) These issues were presented to the BPU for resolution and the parties exchanged several drafts of the proposed interconnection agreement, reflecting each party's interpretation of the Interim Decision and a subsequent FCC ruling regarding Internet-bound traffic. Eventually, Verizon submitted two draft pro-

posals to the BPU for consideration. GNAPs in turn requested that the BPU compel Verizon to execute its version of the interconnection agreement implementing the Interim Decision, or deem that agreement effective. (*See* Moving Memo at 7.) On July 12, 1999, the BPU handed down its Final Decision and Order, basically resolving the two principal issues in Verizon's favor. (*See* Moving Memo at 8.) Following the BPU's determination, the parties submitted an executed agreement which was approved by the BPU on July 26, 1999. (*See* Moving Memo at 8.)

*Motor,* Verizon had a right to contest the arbitrator's Interim Decision regardless of any anticompetitive intent.

Verizon's actions in challenging the Interim Decision were directed to the BPU for the purpose of resolving the outstanding issues regarding the terms of the interconnection agreement. Although the arbitrator did issue the Interim Decision, Verizon had the right to oppose this decision before the BPU. GNAPs's argument seeks to deprive Verizon of this right.

Also, to the extent that GNAPs characterizes Verizon's actions as a refusal to enter into an interconnection agreement, this is not entirely accurate. Verizon simply disagreed with the terms of the proposed interconnection agreement set forth in the Interim Decision. Verizon evidenced its willingness to interconnect however, by submitting an alternate proposed interconnection agreement. These facts indicate that Verizon did not attempt to avoid interconnection, but rather sought resolution regarding terms it did not agree with by bringing its dispute before the governmental agency that had the authority to determine the validity of the terms proposed by the Interim Decision. This conduct, attempting to influence administrative action before the BPU, is entitled to *Noerr–Pennington* protection.

This Court finds that Verizon's conduct in challenging the Interim Decision before the BPU falls within the scope of protection afforded by the *Noerr–Pennington* doctrine.

### 2. *Verizon's Conduct Was Not a "Sham"*

██ GNAPs also "asserts that Verizon's refusal to comply with the BPU rules was a sham designed to facilitate Verizon's plan to delay Global NAPs' (sic) entry into the New Jersey telecommunications market." (Oppos. Memo at 22.) Thus, GNAPs contends that Verizon's refusal to comply with the BPU's rules and execute an interconnection agreement implementing the Interim Decision, and Verizon's subsequent actions before the BPU, are not entitled to *NoerrPennington* immunity because this conduct falls within the "sham" exception to the doctrine.

As an initial matter, because Verizon eventually prevailed before the BPU, it would be contradictory to conclude that Verizon's opposition to the Interim Decision was "objectively baseless." It would also be difficult to find that a challenge made to resolve acknowledged outstanding questions regarding the viability of an agency decision was a "sham." Thus, this Court finds that Verizon' s conduct before the BPU was not "objectively baseless." Because this Court finds that Verizon's conduct was not "objectively baseless," we need not consider Verizon's "subjective motivation," or whether its refusal to implement the Interim Decision and its actions before the BPU were "designed to facilitate [a] plan to delay Global NAPs' (sic) entry into the New Jersey telecommunications market." (Oppos. Memo at 22.)

Based on the above, this Court finds that Verizon's conduct did not constitute a "sham" and is entitled to *Noerr–Pennington* protection.

### V. *Other Arguments*

Finally, Verizon states that this Court should grant summary judgment in its favor because GNAPs's claims fail on the merits. (*See* Moving Memo at 26–30.)

Because this Court declines to consider Verizon's motion as one for summary judgment, (*see supra* note 5), it is not necessary to address the merits of GNAPs's claims and Verizon's request for summary judgment is denied.

## CONCLUSION

For all of the foregoing reasons Verizon's motion to dismiss Counts IV and V of the complaint is granted.